UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ : | |
| GLENDA O'CONNELL : | |
|     Plaintiff, : | Civ. No._____ |
| : | |
| v. : | |
| : | JURY TRIAL DEMANDED |
| COASTAL CONNECTICUT : | |
| COUNSELING, LLC., : | |
| : | DECEMBER 10, 2024 |
|     Defendant. : | |
| _____ : | |

## COMPLAINT

Plaintiff GLENDA O'CONNELL ("Plaintiff") by and through her attorney Kirsten M. Schneider, of Law Office of Kirsten Schneider, LLC, files this Complaint against the Defendant COASTAL CONNECTICUT COUNSELING LLC ("CCC" or "Defendant") . Plaintiff alleges as follows:

## I.    PRELIMINARY STATEMENT

This is Plaintiff's complaint asserts claims for: (1) Religious discrimination (Title VII), (2) Retaliation in Violation of Title VII, (3) Religious Discrimination (CFEPA), (4) Retaliation in Violation of CFEPA, (5) Hostile Work Environment Based on Religion, (6) Violation of the Family Medical Leave Act, Interference; (7) Violation of the Family Medical Leave Act, Retaliation, (8) Violation of CT Family Medical Leave Act, Interference; (9) Violation of CT Family Medical Leave Act, Retaliation, (10) Wrongful Termination in Violation of Public Policy; (11) Breach of Covenant of Good Faith and Fair Dealing, (12) Intentional Infliction of Emotional Distress.

## II.    JURISDICTION, VENUE & PARTIES

1.    Plaintiff is a resident of the State of Connecticut, having her principal residence at

Fairfield, CT.

2.    Plaintiff was employed at CCC from August 12, 2019, through May 22, 2024.

3.    CCC is a business registered in the State of Connecticut and is in the business of mental health care and psychological counseling for individuals, couples, children and families. CCC is located at 2960 Post Road, 3rd Floor, Southport, Connecticut 06890 and 58 Wellington Road, Milford, Connecticut 06461.

4.    This action is authorized and instituted pursuant to 29 U.S.C. § 621, et.seq., and pursuant to 28 U.S.C. Sec. 451, 1331 and 1343(3) and (4).   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.    All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the District of Connecticut.

## III.    PROCEDURAL PREREQUISITES

6.    On July 12, 2024, Plaintiff filed her charge discrimination against Defendant with the Boston Area Office of the Equal Employment Opportunity Commission (EEOC). On August 8, 2024, Plaintiff filed his charge of discrimination with Connecticut Commission on Human Rights and Opportunities (CHRO). A copy of the dual charge was sent to the Defendant on the same dates.

7.    On September 11, 2024, Plaintiff received her Notice of Right to Sue letter from the EEOC regarding CCC, charge number 523-2024-04013. (Exhibit A).

8.    On November 25, 2024, Plaintiff received his Release of Jurisdiction from the CHRO regarding CCC, charge number 2520096 . (Exhibit B).

9.    All administrative prerequisites to the institution of this action have been satisfied.

**IV.    STATEMENT OF FACTS**

10.    In August 2019, Plaintiff began her employment at CCC as a part-time administrative assistant earning $19/hr. She reported directly to Alyssa Kolesar. She was presented with an employment contract. Alyssa is the founder and owner of CCC. When she started, approximately seventeen therapists were employed, and she was one of two part time administrative assistants who supported them. Her responsibilities included, but were not limited to, handling all incoming communication from prospective and current clients, issuing and uploading all new client paperwork, scheduling intake appointments, ensuring HIPAA compliance, paying invoices, satisfying legal and insurance company requests for client notes, assisting in the orientation of new clinical and administrative staff, resolving billing matters and managing the daily operations of the business.

11.    On or about February/March 2020,within seven months of her hire date, Covid struck. Alyssa permanently moved to South Carolina, and Plaintiff's administrative and mentor quit, leaving Plaintiff as point person single-handedly running the CCC business operations. Plaintiff was involved in every aspect of operating the company. Because she was the only staff member in the office daily during Covid, she managed issues with minimal guidance from Alyssa, now residing in SC, such as organizing remediation for a significant mold issue in the office space, navigating ventilation issues and water leaks, dealing with an often-unresponsive building management company, assisting in setting up HR protocols as we did not have a dedicated HR staff member, in addition to her standard administrative responsibilities. Plaintiff assisted therapists' in setting up their calendars, responded to clinicians' technical questions with regard to use of telehealth platforms for therapeutic services, developed new documentation for telehealth services as well as

protocols for staff/clients to safely use the office space during Covid. Michelle Bellin, a former clinician, told her that Alyssa had instructed a group of CCC clinicians, "Do whatever keeps Glenda happy as the business cannot run without her." Plaintiff was definitely viewed as being in charge of the daily operations of CCC by the entire staff.

12. Plaintiff often worked over 60 hours per week during Covid, despite her part-time status, because it was the only way she could keep up with the demands of the business. Plaintiff was not paid an overtime rate for my excess hours. Plaintiff responded to Alyssa's frequent weekend and nighttime communications despite her insistence that her staff develop strong professional work/life boundaries. She would say one thing and do another. In order to keep up with the sheer volume of work, Plaintiff was required to work on weekends from her home. She missed joining her family on vacation in June 2021 because it would have left the main CCC phone unanswered for a week and leave CCC without a physical point of contact in the office. Alyssa had not hired any other administrative staff to support Plaintiff at the time, so all of the administrative responsibilities fell on Plaintiff. Plaintiff did not feel in good conscience that she could leave the phone unanswered when the need for mental health support was overwhelming during the pandemic. Plaintiff worked tirelessly to support CCC.

13. Alyssa admitted to Plaintiff that she had control issues. She told Plaintiff that Plaintiff was to be her eyes and ears when she moved to South Carolina. It surprised Plaintiff that despite Alyssa's acknowledgement of her control issues that she was comfortable leaving the business to move such a distance away. Alyssa's words and actions were often out of sync regarding her control issues. She told Plaintiff to be her eyes and ears, her liaison, and to report business happenings back to her. On one hand she wanted to know details about

4

day-to-day ongoings of staff and operations and would make statements like, "Why wasn't I told of this sooner?" But then she would also tell Plaintiff that she did not want to be involved in minutiae and was frustrated with the volume of emails she received from staff. Plaintiff did her job well, but she was never sure how much detail to share with Alyssa. Plaintiff had not been provided a job description or guidelines for her role. It was a difficult line to navigate with Alyssa due to her inconsistency with such an important issue as communication. Regardless, Plaintiff was motivated to work hard, grow the CCC business and was effectively managing it despite that Alyssa's words and actions often did not match up.

14. Alyssa openly told Plaintiff that she (Alyssa) was more of a big picture thinker, was highly disorganized, had difficulty executing and following through on ideas. These are Plaintiff's strengths, and their skills complemented one another. She would tell Plaintiff that she was thankful for her commitment to the business and Plaintiff's perseverance. Plaintiff considers herself to be a very efficient, structured, diligent, detail-oriented worker who has great ability to see a task to its completion. Alyssa regularly asked Plaintiff to keep her on task with projects, alert her when Plaintiff saw them falling off track, help her to organize herself, work on documentation for her projects, and set up structures so that her business could thrive. Plaintiff helped Alyssa grow her business and Plaintiff was proud of her contributions.

15. Plaintiff was always qualified for her positions at CCC and although she had never received a formal, written performance review from Alyssa, she received many verbal accolades and written letters of praise from her. Never in the five years Plaintiff worked for CCC,

had she ever been disciplined for her work performance, either verbally or in writing, until the retaliatory adverse employment action on Friday May 17, 2024.

16. Despite the verbal praise Plaintiff received from Alyssa, one of the most difficult aspects of her job was managing the emotional distress she suffered caused by Alyssa's hostile statements and passive aggressive communications with her. Alyssa had a way of complimenting you in one breath and criticizing you in the next. Plaintiff was never sure how Alyssa would respond in certain situations. Nonetheless, Plaintiff valued her job and the staff that worked for CCC, so Plaintiff kept pressing forward despite the hostility. CCC were serving a vast growing community that needed mental health counseling during a global pandemic. Plaintiff felt our services were critical to the health and welfare of our surrounding community and she felt a duty to continue to serve the community as best she could through her work at CCC.

17. By August 2020, because Plaintiff was well exceeding the hours of a part time position, her status was changed to a salaried employee. Plaintiff accepted an annual salary of $50,000.

18. In 2021, while Alyssa visited CT, Plaintiff asked her to join Plaintiff and her husband for dinner. During the evening Alyssa mentioned that she had so much trust in Plaintiff that she would like her to obtain my master's degree in counseling. The purpose was so that if and when she decided to sell CCC, she wanted Plaintiff to take it over because Alyssa knew it would continue to be well managed. After giving it much thought, Plaintiff declined her offer but let her know that she was grateful to be considered for it. Alyssa often said that there was no way she could live many states away unless she had Plaintiff running the business for her. Plaintiff's husband heard her say these statements to Plaintiff on many

6

occasions. Plaintiff was appreciative of Alyssa's confidence in her. Alyssa shared with Plaintiff often that she "loved [Plaintiff]" and that because she "had no friends" and very little family that she considered Plaintiff to be not only her friend but part of her family. Alyssa's appreciative notes, and frequent "I love yous" to Plaintiff created a hostile work environment. Plaintiff valued her job and Alyssa's affection and constant friend-like behaviors towards Plaintiff were not welcomed by Plaintiff. Plaintiff was a professional and believed that her relationship with her boss, Alyssa, should be professional, not one of friends. However, every time Alyssa showed affection to Plaintiff as a friend, Plaintiff felt obligated to accept the gesture because she was afraid to upset Alyssa or reject her friendship gesture. Plaintiff had seen Alyssa become cross with employees and terminate their employment if employees did not respond to Alyssa as she expected.  Alyssa was in a position of power over Plaintiff and Plaintiff did not the hostile work environment to escalate.

19.    Throughout Plaintiff's employment Alyssa told her criticisms of many of her CCC colleagues. There was a frequent pattern of conflict between Alyssa and many of the CCC employees. Plaintiff thought many of Alyssa's comments and criticisms were unprofessional, mean, unwarranted, childish; it made Plaintiff uneasy when she would share these criticisms with her. This caused her extreme emotional distress knowing that she could be so cruel. Plaintiff worried that if she was to reject Alyssa's "friendship" that Alyssa would disparage her as well. Plaintiff heard Alyssa speak negatively of former employees including KI, PC, CD, LB, MS, JK, JT, DS, LD, JS, SG, JKe, AS, BB, LP, JF, CP, HS, CB, BT, and GB. On information and belief, many of these statements about these employees were false. She was also highly critical of many current CCC employees.

Plaintiff truly believed that with few exceptions all of the CCC employees were under appreciated by Alyssa; and Alyssa was inappropriate and over critical of them. Because she lived in South Carolina, her physical distance prevented her from seeing the loyalty and wonderful work accomplished by her staff. Plaintiff recalls Alyssa's making several false and malicious insulting comments about AS, MS, CD, and KI. Alyssa said to Plaintiff that AS took time off of work to attend her cancer treatments, but what she really was using the time to set up her personal practice. Plaintiff knows this to be a false statement. Alyssa said to Plaintiff about MS, that the "shit show" MS created while employed at CCC would be felt for years to come. This placed MS in a false light, as Plaintiff knew she did her job well. Alyssa said to Plaintiff about CD that she could not be trusted. Again, Plaintiff's working relationship with CD was that she could trust her and that she did good work. Alyssa said to Plaintiff that KI was on the autism spectrum. Plaintiff knows this to be false. Alyssa made this statement when KI announced her resignation despite KI's fine reputation with her peers and clients for more than two years. On information and belief, Alyssa made this statement to harm KI's reputation. Plaintiff found Alyssa's comments hostile and extremely stressful.

20. Plaintiff could not understand why Alyssa told her the following personal information about her colleagues. Plaintiff knew many of her statements to be false and believed that they were made with malicious intent. Alyssa told Plaintiff that after interviewing PC she was sure, "was on the Autism Spectrum," but CCC was so desperate for clinicians that she hired him regardless (she had no knowledge of a diagnosis, she just made the derogatory and defamatory statement). Plaintiff was shocked that she would criticize a person for being autistic, if he had been autistic. Plaintiff was also startled, because if she knew he

was diagnosed with Autism, Plaintiff felt that Alyssa should not have been disclosing this information to her without his permission. Alyssa told Plaintiff that clinician AE was not a good therapist and she would never send her own children to her. She told Plaintiff that JF had social anxiety, and that CP had an eating disorder. She made these statements as though they were facts or formal diagnoses. On information and belief, none of these employees had the formal diagnoses that Alyssa suggested. Again, Plaintiff thought that it was cruel and incredibly unprofessional for her to be disclosing private health-related information to her about a co-worker, without their consent. She told Plaintiff that JS had been exposed to sexual abuse and that KI was likely on the autism spectrum (again, no diagnosis) and was married to a narcissist. Alyssa told Plaintiff these statements as if they were true. She told Plaintiff that BC was a terrible therapist, and that when LD revealed her father's dementia diagnosis while discussing a work error with Alyssa. Alyssa told Plaintiff, with a sarcastic tone, that Lauren "ugly cried" on the Zoom call. Alyssa was making fun of Plaintiff's co-worker's pain. She said she would have terminated current clinician AK but treaded gently because of the possibility of being sued by her Greenwich-based family. Plaintiff did not think that Alyssa sharing this information with her about her co-workers was appropriate nor did Plaintiff feel there was any reason for her to know the majority of it to perform her job. Alyssa's words were mean, vindictive, false, and hostile. Plaintiff never knew how to respond, so she would just listen to her rant about these employees. This created a hostile work environment. Plaintiff felt horrible for those Alyssa attacked, but she kept her incredible disgust and hurt to herself so not to aggravate Alyssa. Alyssa's hostile treatment of those employees and then gossiping about them to Plaintiff

caused Plaintiff increase stress and anxiety. The emotional distress was so extreme at times that she became physically ill.

21. Alyssa also spoke very critically of clinician, JS after JS complained of race discrimination and retaliation. On or about September 2023, Plaintiff's understanding is that Alyssa believed that JS breached CCC's social media policy. Plaintiff is unaware of any written social media policy. Plaintiff has never seen one. When this happened, Alyssa was in South Carolina, and she called Plaintiff to inform Plaintiff of the instance. She was furious at JS. Alyssa venting to Plaintiff, demanded that Plaintiff called JS (using her cell phone) so she could speak to JS. Both JS and Plaintiff were at the Southport office. Plaintiff was very uncomfortable being instructed by Alyssa to call JS on her cell phone to confront JS in her office at CCC. Plaintiff told Alyssa this. Alyssa, on Plaintiff's speaker phone, shouted obscenities at JS, which could be heard in the waiting room. (Plaintiff had a client who was in the waiting room at the time tell Plaintiff this the next day.) Alyssa yelled things like, "Get the fuck out!" Alyssa then insisted that JS immediately depart from the CCC premises but because JS had been dropped off for work that day, she explained that she needed to wait for her husband who was on his way. Alyssa fired back at her that she did not care where she waited but that she was to leave the premises, or she would call the police. Plaintiff's knees were shaking underneath her and she felt physically sick as Plaintiff was witness and accomplice to what she felt was an unnecessary and a huge over reaction by Alyssa. This sickly feeling of sleeplessness, chest pressure and anxiety continued for days after the event. It caused Plaintiff incredible stress and anxiety that manifested into physical symptoms that lasted for days. It became clear that as soon as Alyssa hung up with JS, Alyssa contacted the police because within moments the police arrived to the CCC parking

lot just as JS's ride arrived. Alyssa's behavior was extremely hostile, disturbing and unwarranted. Afterwards, Alyssa told Plaintiff to deliver a cookie platter and card to the police department to thank them for their quick response time. Kass and Plaintiff delivered the cookies.

22. Alyssa's disparaging statements about employees to Plaintiff was a constant stressor. Beginning on or about 2022, Alyssa's hostile behaviors only escalated an already hostile work environment. Every time Alyssa caused conflict, Plaintiff wanted to resolve things amicably with conversation and communication. As a Christian, Plaintiff is a believer of second chances and giving grace. Alyssa did not like that Plaintiff attempted to resolve conflicts or address hostile situations with conversation versus insults and accusations. Alyssa routinely second-guessed and challenged decisions made by Plaintiff, and also by a member of Plaintiff's administrative team, Liz Jagiello. Alyssa often told Plaintiff of her displeasure with Liz but Plaintiff was unable to see the reason for Alyssa's criticisms of Liz because Plaintiff knew Liz to be a hardworking, dedicated contributor who reported directly to Plaintiff. Liz managed the Milford office and unfortunately had minimal support because the Clinical Director, who was to be present daily, was only in the office every ten days leaving Liz responsible for big building decision-making including: plumbing, air quality, waiting room management, problematic phones/Wi-Fi, inventory/furniture issues and auditory problems in the space. The job was too big for Liz in addition to the important full-time role she fulfilled on the administrative team, but Liz was doing a great job. There was an unspoken understanding that Liz would bring major building maintenance issues directly to Alyssa as Alyssa was the main communicator with the contractor. Liz contacted Alyssa regarding these important matters but Alyssa was resentful of the frequency and

11

style of Liz's communication. Alyssa told Plaintiff she found communicating with Liz to be impossible because, "She reminds me of my mother." Alyssa made it widely known to staff that she was unable to treat Bipolar clients because her deceased mother was Bipolar and her relationship with her mother was severely fractured. Again, Plaintiff was stunned that she was suggesting that Liz was Bipolar. Plaintiff never found Liz's style or frequency of communication problematic and deeply valued the critical, often difficult role she played. Because of her frustration with Liz, Alyssa told Plaintiff that Plaintiff was to be a liaison between Alyssa and Liz to lessen their interactions regarding building maintenance issues. In Plaintiff's liaison role she found Liz's communication to be professional and her gut reactions in problem solving to be on the mark. However, Plaintiff was now given the task to be liaison in addition to her other responsibilities.

23.    In July 2022, Plaintiff was told (not asked) by Alyssa that she was promoted to the role of Director of Operations and her salary was increased. Plaintiff witnessed the two previous Director of Operations' employment come to an abrupt end due to Alyssa's dissatisfaction with them, so Plaintiff had trepidation about taking on the role. Plaintiff asked Alyssa for a job description for this new role to ensure that she would meet her expectations; Alyssa told Plaintiff to write her own job description for the role. Plaintiff never wrote it because she did not feel equipped to do so. Plaintiff told Alyssa the same. Plaintiff was told by Alyssa, "Just keep doing what you are doing - you have already been doing the job for some time." Plaintiff was already providing oversight to the administrative staff for some time as she was its most senior member. The team had grown to five full-time employees and in this new role, the administrative team now officially reported to Plaintiff. The practice had also grown to 50+ clinicians. Plaintiff was not provided with an employment

12

agreement. There was no  employee handbook, no policy manual and no guidelines regarding administrative or Human Resources process and procedures

24.    In the fall of 2022, Alyssa learned that the staff's I-9 information was not being properly obtained, verified and recorded. Alyssa, Kathryn "Kass" Mayer, (Office Manager) and Plaintiff uncovered the extent of the I-9 documentation mismanagement late on a Friday evening. Plaintiff and Kass had planned to go to dinner on Friday night and since Alyssa was in town alone, Plaintiff felt obligated to invite her to dinner. The three of them then met Kass's husband and Plaintiff's husband for dinner. Alyssa, in an utterly disgusted tone, shared the egregious I-9 findings with their husbands and told them that she would be firing Megan Schmitt, HR Director, the following morning. Plaintiff felt horrible that she was making derogatory statements about Megan to their spouses. At this time, Plaintiff was working nearly 70 hours per week as was Kass. Plaintiff's husband respectfully said, "I hope you have a plan in place for Megan's absence. Being that you are in South Carolina, you may not know that Glenda and Kass are working extremely long days and there is no way they can absorb Megan's work as well." Alyssa was very defensive. She turned to Plaintiff in the booth, with hostility, and said "you and Jeff should consider marriage therapy." Plaintiff found her comment incredibly offensive. Again, she was making personal statements towards Plaintiff was made Plaintiff uneasy. Plaintiff told her that for quite a while he had been very concerned about the long hours Plaintiff worked and was fearful about Plaintiff suffering more stress and anxiety and getting further burned out. Alyssa returned to South Carolina and called to confront Plaintiff on Monday morning about how her husband "yelled at her" in the restaurant. In a very angry tone, she told Plaintiff she felt betrayed that Plaintiff's husband informed her that we were overworked

13

"by him yelling at [Alyssa]." Plaintiff told Alyssa that she was steadily trying to keep up with the work volume as best as she could but because Alyssa had mandated that all staff communication was to be filtered through Plaintiff and the Clinical Director (so that she could focus on the upcoming Milford building purchase) Plaintiff had become silently inundated with the magnitude of the work. Plaintiff told her that she was waiting until after the Milford office purchase closing date to discuss her heavy workload with her. She was very angry with Plaintiff and was very defensive about the Friday night interaction. Alyssa kept repeating angrily about how Plaintiff should think of the way she was made to feel being "yelled at in a restaurant by your husband." Alyssa was again overreacting and creating a hostile situation. Plaintiff's husband did not yell. He did not even raise his voice. Two other people witnessed to how Plaintiff's husband spoke to Alyssa and no one would describe that he "yelled at her". When Kass learned of Alyssa's version of the restaurant exchange she said, "I would NEVER say that he yelled at Alyssa - he just told her we [Kass and Glenda] are both overworked and can't take on anything more." This incident showed Plaintiff that Alyssa's perception of events was illogically skewed when she felt challenged.

25.    Towards the end of 2022, the second CCC location was purchased in Milford. Over the course of the next year, Plaintiff was the main Connecticut contact for Zach Sawyer, CCC's contractor, for the full fit out of the new 10,000 SF office space as Alyssa resided in South Carolina. Plaintiff poured herself even more fully into the business, sacrificing late nights and sometimes even weekends when Alyssa visited Connecticut. Purchasing 'an address' as Alyssa referred to it, because everything other than the four exterior walls needed replacement, comes with many headaches. There were unexpected water issues, HVAC

issues, plumbing issues, pest issues, and technical issues during the buildout. Plaintiff tried to remedy problems quickly and quietly when they arose because she had frequently observed Alyssa's over reactions, hotheadedness and over dramatizations during a challenge. Often, Plaintiff made multiple trips a week to the Milford worksite to check on progress, receive or check deliveries etc. Plaintiff along with a few other staff purchased and assembled furniture on weekends; they were not given replacement days for weekend work nor were they compensated for gas and travel throughout the year.

26. It seemed that part of Plaintiff's job duties during her employment included providing counseling to Alyssa. Alyssa is a licensed marriage and family therapist but Plaintiff felt that she played the role of therapist to her as Alyssa shared with Plaintiff her family stresses, personal and business financial stresses, rants about staff, and staff challenges. Plaintiff was, without question, her go-to person and frankly she was everyone else's in the organization as well. At one point in mid-2022 Alyssa shared with Plaintiff that she did not feel as though she was a "good businessperson." Plaintiff surprised her by purchasing and shipping her a book titled "Values Inc: How Incorporating Values into Business and Life Can Change the World." Plaintiff purchased a copy for herself also so that they could read it together in anticipation of the CCC business expansion. Alyssa referenced, often in Directors' Meetings, how much she learned from the book. Plaintiff was willing to do anything she could to support Alyssa. It was Plaintiff's nature to help.

27. Over the years, Alyssa praised Plaintiff's work ethic. However, Alyssa's praise of Plaintiff usually circled back to focus on admiration for herself. Alyssa would say things like, "There aren't many people who work like you and I do." Often at staff-wide meetings and holiday gatherings Alyssa publicly praised Plaintiff's commitment and dedication to the

success of Alyssa's practice and verbalized that its growth would not have been possible had it not been for Plaintiff. Most of the time, in front of other employees, Alyssa and Plaintiff had an easy rapport because Plaintiff always made the conscious choice to interact professionally with Alyssa. However, in private at work, the hostility and condescending remarks Alyssa directed towards Plaintiff and especially Plaintiff's co-workers could be unbearable for Plaintiff to hear. She would discuss with Plaintiff the employees who were her favorites and those who she did not like.

28. Alyssa has the same type of disparaging discussions with Plaintiff regarding hiring new employees. One of Plaintiff's responsibilities as Operations Director was to conduct second interviews. In mid-Fall 2023 one of CCC's black clinicians, CM, referred one of her colleagues to HR for consideration as CCC was actively recruiting clinicians. The black colleague easily made it through the first interview. Kass and Plaintiff met with the candidate virtually for her second interview and afterwards told HR their approval to make an offer to the candidate. Immediately following this, Alyssa told Plaintiff, "I am not hiring any black people," because she had issues with three black staff members whom she terminated between Summer and Fall of 2023. CM excitedly told Plaintiff days afterwards that the candidate was eager to obtain an offer from CCC because she knew from our website that CCC was actively hiring and felt her interviews were positive. The black candidate was denied a job offer. Alyssa was the decision maker who chose to not offer this candidate the job.

29. Alyssa regularly used vulgar language, including the F word, "busting my balls", and sometimes the C word which deeply disturbed Plaintiff. She used vulgar words in jest and in direct conversation. When speaking about her sons to the staff she frequently referred to

16

boys as "the Fuckers" and referred to minor-aged clients as "the little fuckers."  Plaintiff found this incredibly disturbing as Coastal provided services to many minor children. She used this language in weekly Directors' Meetings, in full staff meetings, at staff trainings and with Plaintiff individually. On more than one occasion, Alyssa commented to Plaintiff, "I know I am acting really cunty right now." The vulgar language was used when describing frustrating client situations, clinician situations, and often just to emphasize points in a story.

30. Because cursing was so commonplace with Alyssa, Plaintiff was fearful that one of our directors who also routinely cursed may think it appropriate to speak this way at the speaking engagements Plaintiff orchestrated for her in the community, while representing CCC. Vulgar language was modeled and considered acceptable from the top of the organization, Alyssa. Plaintiff had growing concerns that this use of vulgar language not only affected the staff, but therefore effected CCC's reputation in the industry.

31. In May 2022, Plaintiff had arranged a complimentary, 4-part mental health speaker series, offered to the CCC community as well as the Fairfield community at large.  Alyssa was the featured speaker at the first event focused on Anxiety. The audience at the event was lower than anticipated, so Plaintiff asked that her husband join to make the event appear better attended. Plaintiff received feedback from him after the event that while the content was beneficial, Alyssa cursed throughout her presentation which greatly diminished the professionalism and value of the presentation. Staff also attended the event to bolster the crowd and confirmed to Plaintiff their positive feedback, but that Alyssa cursed throughout it. This was troubling to Plaintiff and she was concerned that Alyssa's hostile behavior and cursing at a public event was harming the reputation of CCC.

32.     On or about September 2022, Plaintiff complained to Megan Schmitt, then HR Director, about how the vulgar language troubled Plaintiff and that she found it unprofessional and offensive. Not only did it add to the hostile work environment, but it caused Plaintiff incredible stress and anxiety as a Christian.  Megan responded to Plaintiff "noted" but Plaintiff never saw any reduction in the use of the vulgar language. On information and belief, Megan never investigated Plaintiff's complaint.

33.     On or about, Spring 2024,  Plaintiff also complained directly to Alyssa that Alyssa's use of vulgar language caused her stress and anxiety and that it offended her Christian beliefs, but Alyssa brushed it off and made light of Plaintiff's complaint. Alyssa did not change her hostile acts towards Plaintiff.

34.     Alyssa knew that Plaintiff is a Christian and very involved in practicing her faith. Many of CCC staff also knew that Plaintiff is a practicing Christian because she wore a Crucifix pendant daily, explained that on Tuesdays, Plaintiff's arrival time would be closer to 8:15am as she had a 7am-8am commitment to Adoration, and had religious items and prayers visible in her private office.  Alyssa and CCC staff regarded her as a highly religious person and knew she was Christian. Alyssa knew that her cursing and vulgar language was offense to Plaintiff because of her religion because, on or about September 2024, she specifically told Alyssa this. Plaintiff had complained to HR previously. Plaintiff does not curse and certainly would not curse in a professional workplace. Staff, including Alyssa, who used such language in front of Plaintiff would often curse and then immediately look at Plaintiff and say, "Sorry Glenda," in a condescending tone; making fun of the fact that she is a Christian, that she did not swear, and was offended by their use of vulgar language. They would give Plaintiff a look as though she was overly sensitive.

They knew they were offending Plaintiff because they verbalized the half-hearted apology but never discontinued the language. This was behavior Plaintiff experienced on a daily basis. Staff and Alyssa, would do this to Plaintiff in front of whomever was present (other staff) which made Plaintiff feel awkward, patronized and singled-out. Alyssa did not sarcastically apologize to anyone else after using vulgar language. Plaintiff was treated differently. Alyssa and all Directors were well aware that Plaintiff was offended and uncomfortable with the language, yet it continued. Plaintiff knows that Alyssa knew her objections to the language she used because Plaintiff raised this with the former HR Director and to Alyssa herself, and her complaints were ignored. Plaintiff did not feel she had recourse other than to try to tune it out. This hostile situation was ongoing and the disregard of Plaintiff's complaints increased her emotional distress and anxiety, extremely upset Plaintiff, and made her feel undervalued and isolated. Alyssa, and other staff, would not make these condescending "sorry" remarks to employees who are not highly religious. Plaintiff was treated differently because of her religious beliefs.

35.  Alyssa was hostile towards her because of her strongly held religious beliefs. Plaintiff is a member of the Roman Catholic Church where she volunteers regularly and is present daily. Alyssa knows that Plaintiff is a person of strong faith because she told her this throughout her years of employment. Alyssa often said callously, "It's because I am a Jew" when referencing that she was frugal with company spending. She referred to herself as a "tough New Jersey Jew" when describing how she enjoyed winning an argument or succeeding in a challenging situation where the odds were stacked against her. On another occasion, as a backwards compliment to Plaintiff, Alyssa stated that she "wanted to know [Plaintiff's] Jesus!" Plaintiff found these references to religion and her language very offensive. She

19

also frequently uttered, "Sweet baby Jesus!" or, "Sweet Jesus," in moments of frustration or celebration. It made Plaintiff very upset that she used these expressions and she would express the same to Alyssa in the moment. Alyssa could also tell that Plaintiff took offense to her comments because she would then look at Plaintiff, in a taunting way, and say, "Oh, sorry Glenda." It was Alyssa's continuous use of vulgar language and anti-Christian comments that caused a hostile work environment. In addition, Plaintiff was witness to Alyssa's blasphemous activities that created such a hostile work environment that Plaintiff would become physically sick with worry about Alyssa's conduct.

36.    While Alyssa's conduct was typically negative, she also harassed Plaintiff by being overly sweet and manipulative with inappropriate notes of admiration and texting Plaintiff that she "loved" her.  On information and belief, Alyssa knew of Plaintiff's forgiving and loving nature and knew that Plaintiff would not reject these gestures. The "love" gestures were not welcomed by Plaintiff, but because of Alyssa's position of power over Plaintiff, Plaintiff could not freely reject such gestures. Plaintiff knew Alyssa to be over reactive and hostile toward employees that confronted her, so Plaintiff tried to ignore the "love" gestures and continue to do her work and look out for the company.

37.    During Plaintiff's time at CCC, she witnessed Alyssa's vulgar, unprofessional and hostile behaviors on several occasions. For example, on a Friday night in July 2021, Plaintiff experienced and was witness to Alyssa behaving in an unprofessional manner and in illegal activity. Alyssa was in town and hosted a happy hour for the staff at the Southport office. She provided alcohol and lite snacks for the CCC staff in attendance. Afterwards, some of the younger clinicians and Alyssa wanted to continue celebrating in a nearby bar. Lauren DeVore, then Clinical Director, begged Plaintiff not to leave her alone with the group, so

20

she went. At the bar Plaintiff witnessed Alyssa grab the breasts of numerous clinicians and laugh about it. Plaintiff was shocked and horrified. Alyssa called Plaintiff the following Monday, once back in SC, and told her, "I get kinda silly when I have had too much to drink." Plaintiff was so disgusted that she was making light of her outrageous behaviors that she did not respond.

Also, in Fall 2023, Alyssa told Plaintiff that when she had been visiting CT, she had smoked pot with some of the younger CCC clinicians on the Milford premises and that she threw up in bushes in front of the building. One of the clinicians who also smoked pot, suffered a fall on the premises and broke her glasses. She experienced a concussion, and was badly bruised. Alyssa told Plaintiff that the clinician slept in her hotel room that night. The employee missed a day of work due to feeling so shaken by the incident. On information and belief, Emily Faro, HR Director, was not witness to this incident, nor was the incident reported to HR or investigated. Alyssa did mention at the Directors Meeting that she "threw up in the bushes," almost to appear that she was popular with the younger clinicians. Staff shared privately with Plaintiff that Alyssa grabbed the breasts of some staff that evening as well. Plaintiff was shocked, angry and deeply disappointed when Alyssa told her of the incidents and Plaintiff was grateful that she had not attended the gathering. This incident was relayed to Plaintiff by Alyssa on the Monday morning after Alyssa returned to South Carolina from her Connecticut weekend. She made light of the pot-smoking and her out of control behavior. She was laughing about it and said, "I have to face that I cannot hang with the young kids like I used to." Plaintiff found herself questioning if she should be working for CCC if this behavior was considered acceptable. Plaintiff felt like she was always on high alert around Alyssa. Alyssa knew this information

21

would bother her because of her religious beliefs but shared this with Plaintiff anyway. Plaintiff could never tell if she would be hostile, or be nice, or swear, or light-heartedly tell Plaintiff some horrendous story of her unprofessional and blasphemous behavior.

38.    In May 2024, Margaret LaPointe, CCC's Head of Compliance, said to Plaintiff, sarcastically, "Isn't it nice when staff leave Coastal and they are not bad-mouthed on their way out the door?" She then said, "It rarely seems to go this way. It would be nice to thank them for their time with us and treat them with respect." Over the years, it became common that as employees resigned, they were slandered by Alyssa in Directors' Meetings. Plaintiff would describe some of the language used as, overstated and inflated, mean and intended to hurt their reputation. When JT, clinician, resigned from CCC Alyssa told Plaintiff, "She's no loss, she couldn't hold onto clients anyway." Plaintiff knew this to be a false statement because JT retained many clients, and most were very upset when they learned that she had left CCC. After CD, former Director of Operations, resigned Alyssa seemed to have a personal mission to shut down CD's new practice. Her irrational and unfair treatment of employees was concerning and caused Plaintiff increased anxiety because she attacked former employees personally with the intent to harm them and ruin their reputations.

39.    Alyssa's hostility caused Plaintiff stress and anxiety. Alyssa was overly suspicious and overly controlling of Plaintiff, despite her verbalizing that she trusted Plaintiff and was thankful for her hard work. In one instance, Plaintiff had gone to lunch with a former employee, Haleigh Smith. It was just a lunch between friendly ex-co-workers. When Alyssa later learned of it, she confronted Plaintiff and wanted to know, "What else you are keeping from me!?" She was hostile towards Plaintiff and Plaintiff was made to feel as

22

though she had done something sinister in not reporting a casual lunch to Alyssa. Alyssa's paranoid overreaction towards Plaintiff for having had lunch with a former colleague caused Plaintiff extreme anxiety.

40.     Over the weekend of May 4-5, 2024, Alyssa worked in the Milford office. Plaintiff was not asked by Alyssa to work that weekend, and Plaintiff typically has the weekends off. However, Plaintiff felt that Alyssa was frustrated that she was not at work because she repeatedly contacted Plaintiff over the weekend about non-urgent matters. Alyssa called Plaintiff and texted her midday Saturday. Plaintiff texted back to let her know Plaintiff was unable to pick up the phone. She wanted to know where Plaintiff thought she could purchase pre-assembled furniture for the office. This seemed like an odd question as less than one year prior, she furnished the entire 10,000 SF office space from a local Milford furniture retailer. Regardless, Plaintiff texted her suggestions. Then at 4PM, Alyssa texted a photo to show Plaintiff a dirty waiting room couch cushion in the CCC Milford office and at 10pm texted a photo to show Plaintiff that she had cleaned the cushion. (She blamed the dirty couch cushion on Liz and said that if Liz better managed the use of the waiting room the cushion would not have been soiled. She said that Liz should have made her aware sooner of misbehaved children in the waiting room who likely soiled the couch. This seemed totally unreasonable to Plaintiff.) It seemed that Alyssa was looking for reasons to contact Plaintiff and start a conflict. Weekend texts, phone calls, and late midweek communication from Alyssa was common but typically for important matters. Plaintiff perceived that the intent of this weekend communication was to remind Plaintiff that she was working, and Plaintiff was not and to make Plaintiff feel guilty. This was a hostile act.

23

41. On May 6, 2024, Plaintiff attended an Administrative Team meeting. Present at this meeting were Plaintiff, Liz Jagiello (Office Manager, Milford), Kathryn 'Kass' Mayer (Office Manager, Southport), Sonya Tombline, (Intake Coordinator, Southport), Dawn Mastronardi (Biller, Milford), Jennifer Kessler (intake coordinator/HR support, remote staff) and Alyssa. The previous Friday there was tension between Alyssa and Liz due to Alyssa learning that a vendor arrived unannounced at the Milford location to check the front doors. At the time, Liz relayed this to Plaintiff at the time of the incident, as she had been told by Alyssa to filter all contact through Plaintiff; Plaintiff advised Liz that so long as they were in a  company-identified vehicle and the servicemen presented  a business card then to let them check the doors. Plaintiff called the vendor to confirm that they were a vendor who worked on the Milford fit out. Alyssa, as usual, implied that Liz mismanaged the situation and quickly snapped that the servicemen, "Were probably casing the joint," and would put CCC in danger of a future security issue. Alyssa let Plaintiff know that she was displeased with how Liz handled it, but Plaintiff confirmed that Liz was not at fault because she had made Plaintiff aware of it upon their arrival. Plaintiff's assessment was that Liz managed the situation perfectly, followed the protocol that Alyssa established by using Plaintiff as the liaison, followed Plaintiff's guidance as to how to handle it while Plaintiff confirmed they were our vendor. Again, Alyssa did not want communication from Liz but was then critical of her for following Alyssa's own communication instructions perfectly. There was also brewing tension between Alyssa and Kass which stemmed from an interaction where Alyssa insinuated that Kass added a $4 personal health and beauty item to the shopping cart while we were shopping for items to create staff appreciation baskets. Alyssa, Kass and Plaintiff all added items to the Marshall's shopping cart, which

24

Alyssa paid for with the CCC credit card. Alyssa claimed that Kass had stated that she wanted the item, personally, and then put it in the shopping cart with the company items being purchased.  This was a blatant inaccuracy as Kass never stated that she wanted the item and they knew every item being put in the cart were components for the clinician gift baskets. Plaintiff was present during the shopping trip and knew this to be a false accusation. Hence, during this Monday morning administrative meeting,  tension was simmering based on Liz's and Kass's interactions with Alyssa. Alyssa then launched into a heated monologue about the lack of cleanliness she observed while working in Milford over the weekend. The administrative team concurred and reminded her that for quite some time they had brought this problem to her attention. They said that much of the time, the administrative team cleaned up after the staff so as to present the space professionally to clients. Alyssa hammered the administrative team sternly with, "You are part of the problem!" by cleaning up after the staff. The final issue was related to the installation of a Ring camera in the staff kitchen. Alyssa had previously shipped a Ring camera to Plaintiff when they discussed this same issue with her which Alyssa wanted Plaintiff to install in the staff kitchen so that she could keep track of staff offenders. Plaintiff was very uncomfortable with this idea, feeling that staff would not take kindly to being watched and recorded; Plaintiff never installed the camera. Alyssa reminded Plaintiff of this during that morning's administrative meeting and Plaintiff reconfirmed her discomfort with the approach. Kass Mayer supported Plaintiff in her viewpoint. She knew that Alyssa previously sent Plaintiff the Ring camera and was in agreement then, and in May 2024, that CCC should not install the camera to watch and record the staff. Alyssa was angry and said, "Glenda I can feel your icy stare in South Carolina!" Plaintiff was insulted by her

25

comment and again stated that she was uncomfortable with videoing and recording staff images and conversations. The meeting became more intense and it was clear that Alyssa was angry at Plaintiff Glenda, Kass and Liz.

42.    After the meeting Kass was in tears about Alyssa's completely inaccurate accusation about her supposedly putting an item on the company's tab. Kass was in tears while discussing this with Plaintiff, saying she felt distrusted by Alyssa's false accusation. Liz was in tears the following day regarding the supposed potential security issue that Alyssa implied was the result of her actions. Liz told Plaintiff that no matter what action she took she was made to feel that she was always wrong, specifically saying, "I am damned if I do and damned if I don't." She felt that because her judgment was so often questioned and criticized that she may be fired. With the number of times Plaintiff defended Liz to Alyssa, Plaintiff too felt that Alyssa firing Liz was entirely possible. Plaintiff knew that Alyssa's allegation towards Kass was false and that her criticisms of Liz were unwarranted. Liz and Kass were both afraid to confront Alyssa about her unfair and hostile treatment towards them. Plaintiff knew the morale of the team was plummeting. Plaintiff, collectively with Liz and Kass, agreed that Plaintiff would bring these issues to Alyssa on their behalf. The hostile work environment, making false statements about them, and criticizing them unfairly really upset Plaintiff. Plaintiff felt that she owed it to them, and to Alyssa, for the benefit of the company, to discuss Alyssa's hostile treatment of Liz and Kass with Alyssa. Plaintiff's gut told her it would not be an easy conversation as Plaintiff knew how Alyssa handled being confronted with uneasy topics, and often overdramatized things when someone challenged her. Considering that Alyssa insisted that Plaintiff be her eyes and ears, Plaintiff needed to

bring a concern of such significance to her attention.  Plaintiff contacted her on May 8, 2024.

43.     On May 8, 2024, Alyssa had been focused on the work/life balance of the clinicians and shared with Plaintiff that she was fearful of a possible 'clinician coup'. (She had recently instituted higher productivity quotas for the clinicians and the clinician feedback revealed that it was leading to a poor work/home life balance for them. She was concerned that clinical staff may seek employment elsewhere.) Plaintiff opened the conversation with Alyssa by letting her know that her team's morale was low and that Plaintiff was concerned about a possible 'administrative team coup.' She was surprised. Plaintiff presented the issues to her, from the accusation towards Kass, to constantly questioning Liz, to the 'you are all part of the problem' about the office maintenance. Plaintiff told Alyssa that her words were hostile and hurtful to the team. Plaintiff reminded her just how hard everyone worked and that despite the fact that one of our employees departed in the Fall of 2023 and was not replaced, that the team continued to produce at the same or higher level and were a big factor in CCC's growth. (The practice now employed over 50 clinicians at the two locations.)  In part, Plaintiff was trying to express that because CCC serves the mental health community at large, CCC needs to focus on a healthy working environment for our employees, both clinical and administrative, in order to effectively serve the public. Plaintiff was trying to explain her concern that there was a ripple effect of treating CCC employees poorly and that it would affect how the mental health of the community CCC serves would be affected.  Plaintiff was also trying to express Liz and Kass's complaints of emotional distress and a hostile work environment. Alyssa's response was defensive and hostile. She defended her hostile behavior towards Kass and Liz. She felt very strongly that

Kass had personally put the $4 item in the basket and that she needed to protect the company's finances.  Plaintiff reminded her that Plaintiff was in the store and never heard Kass express that she wanted the item, and that Kass and Plaintiff were both well aware that all items purchased were intended for the CCC staff baskets. Alyssa vehemently said EG vendor was not a vendor of CCC and that Liz mismanaged the situation as she had done with the children's waiting room behavior, resulting in the soiled couch. Plaintiff let her know that not only was EG a vendor but that Liz had made Plaintiff aware of the vendor visit and the child's behavior in the moment that they were happening.  Plaintiff also reminded her that she made it quite clear that Liz was to filter all communication through Plaintiff and that Plaintiff had provided Liz guidance in both matters. Rather than listening, reflecting and having a professional conversation, Alyssa justified her actions, became angry with Plaintiff, and questioned why Plaintiff did not align with her to defend her actions to the staff. Alyssa wanted to know why Plaintiff did not show her the same empathy and compassion that Plaintiff offered to Liz and Kass.  Plaintiff expressed to Alyssa, that as the Director of Operations, all of the administrative team reported to Plaintiff and Plaintiff felt she had an obligation to bring up the plummeting morale, caused by Alyssa's actions, and that Plaintiff had a duty to report it to her. Plaintiff also felt she had a duty to discuss with Alyssa how this low morale may affect the public at large and CCC's reputation. Alyssa was making false accusations against Liz and Kass and Plaintiff wouldn't agree and participate in the hostile attack.  Plaintiff felt she was doing her job in protecting her employees' rights as well as considering CCC's interest and reputation. Plaintiff never spoke negatively of CCC or Alyssa to the staff.  Plaintiff did not raise her voice and she kept a very professional and sensible tone. At the end of their conversation,

28

Plaintiff told Alyssa that she would be leaving for the day as Plaintiff was completely overwhelmed; she felt incredibly stressed and unwell. For many years Alyssa told Plaintiff that because Plaintiff regularly worked such long hours, she was welcome to leave work to handle personal matters, self-care, or just to relax on a stressful day. Plaintiff standard work hours were 8am - 4pm although Plaintiff typically left work after 6pm. The day of this conversation, Plaintiff decided it would be a good day to take her up on this offer, and at the end of the conversation Plaintiff said to Alyssa "I think this may be the end of my day today - no, actually I know it's the end of my day - I'll talk to you tomorrow." Plaintiff motioned into Kass's office, as she was on a phone call, that Plaintiff was leaving for the day. As Plaintiff left, her heart was racing, she was extremely anxious, she felt pressure in her chest and she felt sick to her stomach.

44. On May 9, 2024, Alyssa asked that Plaintiff have a virtual conversation with her. Plaintiff expected that she had reflected on the previous day's conversation and would apologize to her. Instead, she continued to defend herself, challenging what Plaintiff presented to her the day before and providing more justifications for her actions. Alyssa said that her lawyer had told her to fire Kass previously about the pending legal matter with JS. She said that because "she loved Kass so much" she was taking on $40,000 worth of legal bills to prevent JS from suing Kass personally. What Alyssa had forgotten was that she previously had shared with Plaintiff and Kass, was that J S was bringing a legal action against Alyssa individually, and also against CCC for was a claim of retaliatory termination based on race, and not related to Kass's innocent interaction with JS. Plaintiff and Alyssa were not making any headway in bringing one another to see each other's point of view so the conversation ended without resolution.

45.    On May 10, 2024, Plaintiff received a phone call from Emily Faro (HR). It surprised Plaintiff when she told Plaintiff she had been informed by Alyssa of Alyssa's difficulty communicating with her. Emily was offering Plaintiff help in communicating with Alyssa. Plaintiff let her know that she was appreciative of her offer and asked if they could meet when she would be in the office, on May 14, 2024.

46.    On May 14, 2024, Plaintiff met with Emily in CCC's Southport office. Plaintiff was able to tell her Plaintiff's perspective of the conversations she had with Alyssa on May 8-9, 2024. Plaintiff told her that she was reporting the complaints and concerns of her direct reports and that she had similar concerns about Alyssa's hostile treatment of Plaintiff, Liz and Kass. Plaintiff reported that the hostile work environment had become so pervasive that it interfered with their ability to do their work, and she was concerned with the resulting effect it could have on the mental health community at large. At the end of their meeting, Emily said "this makes sense to me" and thanked Plaintiff for voicing her concerns and the concerns of Kass and Liz because Emily said that had Kass and Liz opted to resign, it would have had significant negative impacts on the business.

47.    On May 15, 2024, Alyssa texted Plaintiff again regarding the issue. This was now their third conversation on the same topic. They again met over Zoom and Alyssa continued to defend herself but now she was saying that she had an obligation to ensure that, "Liz is not raped or abducted," which is why she was so concerned about the visit by the EG vendor. Alyssa's comments were completely misplaced and nonsensical. She also stated that she felt Kass was "flippant" about an error she had made in the past which is why she was so concerned about the health and beauty item being put into the basket. Plaintiff knew this was NOT the case and reminded her of Kass's loyalty to CCC and that Kass was crying

when she became aware of her past error. Plaintiff insisted that there was no pattern of careless or flippant behavior by Kass. It seemed as though Alyssa was trying to create conflicts with her staff that did not exist to justify her distrust of them. Alyssa described Kass as being ditzy and prone to errors. Plaintiff KNEW this was not the case and continued to defend Kass's reputation. Alyssa wanted to know why Plaintiff did not give her the benefit of the doubt in these interactions and kept repeating, "But you know me!" which Plaintiff assumed was her attempt to make Plaintiff feel guilty for not defending her to the team. Plaintiff reminded Alyssa about her hostility towards her when Plaintiff had not reported her lunch with Haleigh, and said, "What kind of boss would I be to Liz and Kass if I had not shared these issues with you?" Alyssa was extremely angry and pointed at Plaintiff in the computer monitor shouting, "That's just it! You are NOT their boss!" in a combative tone.  Plaintiff was shocked. Plaintiff hired, trained, and was the administrative team's point person for almost two years. Plaintiff asked Alyssa who their boss was, and she said that it was her. Plaintiff reminded her that when they met on April 22, 2024, to discuss Plaintiff's responsibilities, she approved that Plaintiff's primary role was "Oversight of the administrative team and the non-clinical, smooth-running operations of the business." Plaintiff questioned, how was she no longer their boss? It was very challenging to follow the constant mixed messages communicated by Alyssa and the inconsistently followed or enforced policies she created. There was no employee handbook or employee guidelines, policies or procedures. Alyssa then questioned Plaintiff's professionalism in leaving work after their conversation on May 8, 2024. Plaintiff reminded her of the invitation she had made to Plaintiff that Plaintiff could leave work whenever she felt she needed it. Plaintiff and Alyssa were not seeing eye to eye. Alyssa

31

then laid her head down on her bent arm, which was resting on her desk, and began to sob. Alyssa's reaction was again irrational. Plaintiff was very uncomfortable seeing this and said, "I think we have made as much progress as we can today, Alyssa." and the meeting came to an end.

48. In three conversations with Alyssa, over the course of one week, May 8-15, 2024, Plaintiff continued to try to speak up for her rights, the rights of her staff and the reputation of CCC. Plaintiff also tried to help Alyssa understand why Plaintiff felt that this was her duty to Alyssa, the employees and CCC. Plaintiff wanted her to understand that she feared that because these were not isolated incidents, and because neither of the staff members felt they could approach her themselves, that Plaintiff was trying to ensure that they would not resign from CCC. Plaintiff also wanted to voice her feelings to Alyssa that she had created a hostile work environment that was affecting their abilities to do their jobs. Plaintiff wanted her to understand that her hostility towards her staff, including the use of vulgar language in the workplace and at public seminars was negatively affecting the workplace atmosphere and could potential impact CCC's reputation in the community. Plaintiff was concerned for the well-being of the business. Plaintiff wanted her to understand that if she was suspicious that Plaintiff had not shared her lunch date with HS, then a matter of such gravity with her team should certainly be shared with Alyssa, and that Liz and Kass asked that she be the one to share their concerns with her.

49. On May 17, 2024 (Friday at 4:15pm) Alyssa emailed Plaintiff informing her that a letter (attached to the email) would be placed in her personnel file. Emily was also cc'd on the email. In the email Alyssa stated that the letter documented Plaintiff's "lack of professionalism" and "insubordination" about the conversations that she had with her on

behalf of Liz and Kass.  This was an adverse employment action.  This was an act of retaliation. Plaintiff never received a negative performance review, never an oral warning, and never received any sort of disciplinary action in her tenure at CCC. Plaintiff had spoken professionally to Alyssa, but Alyssa maliciously defined it as "unprofessional" because Plaintiff did not validate the explanations Alyssa provided for her behavior. If Plaintiff disagreed with her, then she was "unprofessional." Plaintiff was shocked to receive the letter. Plaintiff knew that the allegations within the document were false and that she needed to defend herself and correct the record. The following quoted statements contained in the letter were made with the malicious intent to harm Plaintiff: 1) "Telling your boss, at the end of that conversation that I am leaving and I am not sure if I am coming back." This is a false statement. Plaintiff NEVER made this statement. What Plaintiff told her was that "I think this is the end of my day - no, it is the end of my day - I will talk to you tomorrow." Their conversations were going nowhere as Alyssa continued to dismiss what Plaintiff knew to be true, and repeatedly justified her actions toward Kass and Liz. Alyssa dug her heels in and had a conversation, just providing empty excuses. 2) "The manner in which you communicated your concern was unprofessional." Plaintiff's tone was never hostile, combative or unprofessional. Plaintiff spoke to Alyssa in a normal tone and never raised her voice. However, because Plaintiff did not support Alyssa's behavior, Alyssa deemed her tone "hostile, combative and unprofessional." All CCC employees will agree that in every discussion, whether Plaintiff agrees with someone or not, Plaintiff is always professional in her tone and candor. 3) "This was not an appropriate way to communicate your needs at the time." Over five years Plaintiff conducted herself appropriately and professionally in every encounter with Alyssa and every other employee in CCC. Plaintiff

33

advocated for her employees who complained to her about her unfair and hostile treatment of them by Alyssa. It was appropriate for Plaintiff to have a discussion with Alyssa about their concerns. It was appropriate for Plaintiff to have a discussion about how Alyssa's vulgar comments offended her religious beliefs. On the contrary, Alyssa exhibited unprofessional behavior when in our third conversation she lay her head down and sobbed. 4) "However, your tone and the level to which you are speaking to someone should remain respectful and professional, which it absolutely did not in this meeting or the subsequent two meetings we have had together." This is a completely false statement. Plaintiff spoke in a respectful and professional tone. What Plaintiff previously learned about Alyssa is that when challenged she does not remember details accurately, takes things out of context, conveniently leaves out facts that accurately tell the whole story, creates false narratives to serve her interests, or over dramatizes parts to portray herself as the victim. In the letter she completely, and intentionally, misrepresented the "facts" and Plaintiff's behavior. Her intent was malicious. She shared these false statements about Plaintiff to CCC's HR manager, Emily. Plaintiff was humiliated. This was an adverse employment action and in retaliation for participating in protected activity.

50.     The letter emailed to Plaintiff on Friday, May 17, 2024 and added to her personnel file, contained numerous misstatements, misleading facts, and frankly lies. Plaintiff knew this needed to be corrected ASAP, but her mother was in the hospital having just suffered a heart attack, so Plaintiff responded immediately asking to have until the end of week to respond to the document given Plaintiff mother's situation. Plaintiff's email requested, "I have received this and will try to have response to you by week's end. My mom had a heart attack last week and I will be spending overnights with her this week." Neither Alyssa nor

34

anyone from CCC responded to her email request for leave to take care of her mother. Not only did Plaintiff not receive a response to her request for time to respond in order to care for her mother's serious health condition but was fired less than 72 business hours later.

51. In the letter Alyssa accused Plaintiff of not following protocol or abiding by company policy. She was referring to an incident that occurred between a clinician and one of Plaintiff's administrative team members where Plaintiff needed to step in and help resolve the issue. The issue occurred primarily due to an unclear company policy with regard to client scheduling. The stated policy was confusing and unclear, and thus was not being followed or enforced by anyone. At a Directors' Meeting subsequent to the incident, Plaintiff raised the concern that the policy was unclear and explained the situation that had occurred. Everyone, including Alyssa, agreed that the policy needed to be updated and adhered to or be better enforced in order to prevent further incidents. Alyssa stated at the meeting that she would work on revising the policy. In effect, not only did Plaintiff resolve a problem caused by an unclear policy, but Plaintiff also initiated improvement to the policy to prevent issues in the future. Alyssa took part in the conversation at the meeting regarding the policy and gave no indication that she disapproved of the way Plaintiff handled the incident. At the time of Plaintiff's termination, Alyssa had not communicated a revision of the policy to the staff.

52. Plaintiff was incredibly distraught that Alyssa would make blatantly false statements in an HR document to be added to her employee file, twisting facts and fabricating details. Alyssa's accusations of Plaintiff being unprofessional or using an inappropriate tone are absolutely false. This caused Plaintiff incredible stress and anxiety.

53.  In the May 17, 2024 letter, Alyssa stated that if Plaintiff needed support to communicate with her, Plaintiff should "follow policy" and "communicate with HR."

54.  Over the weekend of May 18-19, 2024, Plaintiff was emotionally distressed to the extent that she felt physically ill. Plaintiff had not been feeling well for months due to the stress of a hostile work environment, but now her symptoms had skyrocketed. Plaintiff was barely eating, had difficulty digesting, was experiencing chest pressure and rapid breathing, and was sleeping minimally at best, due to receiving the letter. Plaintiff was unable to think about anything other than the fact that Alyssa lied about her and completely misrepresented the content and tone of our discussions to injure Plaintiff's reputation and paint her in a negative light. Alyssa had communicated these lies to Emily as well. Plaintiff believed that her intent was malicious and she made these false statements in order to harm Plaintiff's good reputation. Plaintiff had seen her on numerous occasions make false and malicious statements about other employees and now she was doing the same to Plaintiff.

55.  At 8am on Monday May 20, 2024, Plaintiff acknowledged receipt of the letter to Alyssa and Emily in HR. Plaintiff explained that due to her mom having had a heart attack, she would be unable to respond to it until later in the week.  Plaintiff 's mom is 94 years old. Plaintiff also explained that because her hospital discharge was impending and Plaintiff expected that she would be sharing overnight shifts with her sibling to care for her mom to ensure her safety during the night. Plaintiff knew she would not be able to give the letter the attention it warranted under the circumstances. Plaintiff's intent in her emailed response was to notify Alyssa that she was managing her mother's serious medical condition, that she needed time off to help her mother, and therefore she needed time to respond to the allegations and falsehoods in the letter. Neither Emily nor Alyssa suggested that Plaintiff

take time off to help her mother. Plaintiff was on her own to manage work and her mother's care. Emily texted Plaintiff at 11am that day to express that she was sorry to hear that Plaintiff's mom was ill. Alyssa texted Plaintiff at 12pm that day to express that she hoped her mom was doing okay. Both Emily and Alyssa acknowledged that Plaintiff was caring for her mother's serious medical condition, but neither Alyssa nor Emily acknowledged Plaintiff's request for time to tend to her mom's care; nor did they express that Plaintiff's written request for time to respond was problematic. CCC did not have a policy related to an employee requesting medical leave to care for a family member or any procedure to request FMLA leave. Plaintiff was distraught and overwhelmed when requesting medical leave and made her best, and good faith, efforts to request more time to respond to the false allegations in the letter.

56. Plaintiff felt that she was directly experiencing the side of Alyssa that countless other had fallen victim to, alluded to in the Margaret LaPointe, Director of Compliance's comments the previous week. Plaintiff was overwhelmed with grief and worry. Plaintiff was worried that Alyssa would retaliate against her for requesting time off of work. CCC was not responding to her request for time off, so Plaintiff made sure she came to work the following day.

57. On Tuesday, May 21, 2024, unannounced, Alyssa arrived in the Southport office late in the afternoon. She informed Kass that she needed to speak with Plaintiff. Plaintiff's work hours are 8am-4pm but rarely does she leave at 4pm. That particular day, Plaintiff did leave on time to be with a lifelong friend in NY who had just lost her mother. Alyssa told Kass that it was fine to inform Plaintiff that she was in CT and that she could let Plaintiff know she wanted to talk to Plaintiff the following day. Kass called Plaintiff at 9pm that evening

to provide this information.  Plaintiff was still so troubled by the false accusations in the letter and was trying to work on a response to it in her head, while also dealing with her mom's serious health condition. Plaintiff felt she wanted HR's support to discuss the situation with Alyssa in-person the next day, to correct the inaccuracies in the document. The letter had mentioned that if needed, Plaintiff could contact HR to help her.

58. On Wednesday May 22, 2024, prior to Plaintiff's arrival at the office, Plaintiff emailed Alyssa and Emily (HR) and asked that Emily be present for their conversation later in the day. In the email Plaintiff also advised them of her availability for the upcoming discussion. At 8am Plaintiff arrived at work and coincidentally met Alyssa in the CCC kitchen. She asked if Plaintiff knew why she had arrived in CT. Plaintiff let her know that she was still processing the events of the past few days and intended to do a lot of listening in their upcoming meeting. Plaintiff asked if she had read the email Plaintiff had sent requesting Emily's presence in our meeting. She looked surprised by this and responded that she had not yet seen Plaintiff's email. She then looked at her phone, read the email, and said in a snarky tone, "Are you really willing to give up five years of friendship over this?!" Plaintiff had no idea what she was talking about. It was a hostile and threatening statement. Plaintiff did not, and still does not, know what offended her about Plaintiff's request for HR's presence because Plaintiff was following the guidance spelled out in her HR warning letter of May 17, 2024. Plaintiff reminded her that she had written Plaintiff up and provided her the guidance to involve HR if Plaintiff wanted it. Alyssa then shouted, "Just go!" in a disgusted tone of voice as she flailed her hand towards Plaintiff, dismissing her. Plaintiff was numb and questioned, "Are you letting me go?" She said, "Yes", walking out of the kitchen. To this day Plaintiff has not been provided a reason for her termination. Plaintiff

38

was absolutely shocked. Plaintiff's dismissal was unlawful and retaliatory for reporting Alyssa's hostile treatment, for reporting the complaints of Plaintiff's direct reports, and for requesting HR's attendance at their upcoming meeting. Plaintiff returned to her office and began to pack her belongings. One of the CCC Directors, not knowing the events that had transpired, entered her office to discuss a work matter. When Plaintiff explained that she had just been let go, the employee began to cry and hugged Plaintiff for a considerable period of time. Kass arrived at work and assisted Plaintiff in packing her belongings. Plaintiff left the parking lot for the last time shortly after 9:30am.  She was crying and felt ill. No one overheard our conversation in the kitchen.

59.    At the time, Liz and Kass were not terminated or disciplined in any way.

60.    Plaintiff was unlawfully terminated in retaliation for bringing her direct reports' complaints of hostile treatment to the attention of Alyssa and HR, for complaining about Alyssa's hostile treatment of Plaintiff, for telling Alyssa that Plaintiff was concerned about the emotional health of the CCC staff and how it could affect how well CCC services their clients, and for requesting HR be present at their May 22, 2024 meeting.

61.    Plaintiff suffered a hostile work environment based on religion and was consistently patronized by Alyssa by her use of vulgar language, her toleration of others' vulgar language, and for her unprofessional, inappropriate, illegal behavior. Alyssa used her position of power over Plaintiff, and her knowledge that because of Plaintiff's religious beliefs, Plaintiff would not be confrontational and instead, would be compliant to Alyssa's demands including her acceptance of friendship-type gestures. CCC's unlawful acts caused Plaintiff to suffer physical and emotional distress and damages.

**<u>CLAIMS</u>**

39

**V.    COUNT ONE:    RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq.**

62.    Paragraphs 1-61 are hereby incorporated by reference the same as if fully pleaded in Count One.

63.    Plaintiff, on the date of termination, and at all relevant times in question, was a highly qualified and respected employee of the Defendant, pursuant to Title VII of the Civil Rights Act).  At all times, Plaintiff was qualified to perform her job duties.

64.    On information and belief, Defendant exhibited a continuous pattern of religious discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

65.    Plaintiff is a member of the Roman Catholic Church. The majority of employees and the Owner of CCC, Alyssa Kolesar knew that Plaintiff was a highly religious Christian. They knew she attended mass daily and was very active in her church.  Plaintiff's religion is not just something she practices; it is part of her identity, her core values, and how she lives her life. Plaintiff wore a crucifix around her neck and would openly discuss her volunteer work with the church and her religious pilgrimage trips.

66.     The majority of employees and the Owner of CCC, Alyssa Kolesar knew that because of Plaintiff's religious beliefs, she did not swear and was offended by swear words and vulgar language.

67.    Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of her religion, harassment, hostility, retaliation, and termination, all taken because of her religion.

68.    Circumstances surrounding the adverse employment actions give rise to the inference of

religious discrimination. Plaintiff was constantly mocked and ridiculed for her Christian (Roman Catholic) religious beliefs by her supervisor, Alyssa, and by her peers while non-Roman Catholics were not mocked or ridiculed.

69. Frequently, Alyssa Kolesar would swear at or around Plaintiff using curse words such as fuck and cunt and making vulgar comments like "what the fuck," and "get the fuck out!" Alyssa would use the F word as an adjective constantly. Alyssa also would regularly make sexually charged and vulgar comments like, "busting my balls," "little fuckers," and "I'm acting cunty right now." Plaintiff's co-workers, seeing that the owner used such vulgar and crass language, would also swear at or around Plaintiff during meetings. Most every time, Alyssa would use a vulgar phrase or swear around Plaintiff, she would look directly at Plaintiff with a snarky grin and sarcastically say, "Oh, sorry Glenda," acknowledging that Plaintiff did not approve of the language and was offended by the language. CCC employees caught on to Alyssa's mocking and hostility towards Plaintiff, so they began taunting her too by using swear words and then saying to Plaintiff, "Oh, sorry Glenda." Alyssa did not sarcastically apologize to any other employee after using vulgar language, only to Plaintiff.

70. When Plaintiff's employment was terminated, Defendant never stated a reason for the termination. Any reason Defendant provides now for the adverse actions are clearly pretextual and false.

71. Plaintiff's religion was the reason for, and was a contributing factor to, Defendant's denial of her equal treatment in the terms, conditions and privileges of her employment.

41

72. On information and belief, Defendant exhibited a continuous pattern of religious discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

73. Plaintiff was treated differently than similarly situated non-religious employees. Plaintiff was discriminated against because of her religion.

74. Defendant's actions caused Plaintiff damages.

75. Defendant should be held liable for discriminating against Plaintiff because of her religion, in violation of Title VII of the Civil Rights Act.

## VI.    COUNT TWO:    RETALIATION BASED ON RELIGION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq.

76. Paragraphs 1-75 are hereby incorporated by reference the same as if fully pleaded in Count Two.

77. Plaintiff participated in protected activity when she complained to Defendant that she was treated differently because of her religion. On several occasions, Plaintiff stated to her superior, Alyssa, that she was offended by her use of swear words and vulgar language.

78. In September 2022, Plaintiff complained to Megan Schmidt, HR, that Alyssa's vulgar and crass language was offensive to her because of her religion.

79. In early Spring 2024, Plaintiff complained to Alyssa that Alyssa's vulgar and crass language was offensive to her because of her religion. Plaintiff also complained to Alyssa that she was afraid that Alyssa's use of vulgar language was harming CCC's reputation in the industry and community.

80. On May 14, 2024, Plaintiff complained to Emily Faro, HR, that Alyssa's vulgar and crass language was offensive to her because of her religion and that Alyssa had created a hostile

work environment. She expressed that Alyssa's hostile treatment caused her stress and anxiety. She also expressed her concern that low staff morale would have a negative effect on CCC's reputation in the industry and its effectiveness to provide good counseling services. Plaintiff also complained on behalf of her direct reports, Liz and Kass and expressed their ongoing emotional distress because of Alyssa's behaviors towards them.

81.    On May 17, 2024, Plaintiff received an adverse employment action when she received a disciplinary action letter stating that her complaints of discrimination and hostile work environment (on behalf of herself, Liz and Kass) constituted "insubordination." This was an adverse employment action. This letter was in retaliation for Plaintiff taking part in protected activity.

82.    On May 22, 2024, Plaintiff's employment was terminated. This was an adverse employment action and in retaliation for taking part in protected activity.

83.    Defendant's actions caused Plaintiff damages.

84.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**VII.    COUNT THREE:    RELIGIOUS DISCRIMINATION PURSUANT TO CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT, C.G.S. §§46a-60 et seq.**

85.    Paragraphs 1-84 are hereby incorporated by reference the same as if fully pleaded in Count Three.

86.    Plaintiff, on the date of termination, and at all relevant times in question, was a highly qualified and respected employee of the Defendant, pursuant to Connecticut's Fair Employment Practices Act (CFEPA).

43

87. On information and belief, Defendant exhibited a continuous pattern of religious discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

88. Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of her religion.

89. Circumstances surrounding the adverse employment actions give rise to the inference of religious discrimination. Plaintiff was constantly mocked and ridiculed for her Christian (Roman Catholic) religious beliefs by her supervisor, Alyssa, and by her peers while non-Roman Catholics were not mocked or ridiculed.

90. Plaintiff's religion was a substantial motivating factor for denial of her equal treatment in the terms, conditions and privileges of her employment.

91. Plaintiff was treated differently than similarly situated non-Roman Catholic employees.

92. Plaintiff was discriminated against substantially in part because of her religion.

93. Defendant's actions caused Plaintiff damages.

94. Defendant should be held liable for discriminating against Plaintiff substantially in part because of her religion, in violation of CFEPA.

## VIII.    COUNT FOUR:    RETALIATION BASED ON RELIGION, C.G.S. §§46a-60 et seq.

95. Paragraphs 1-94 are hereby incorporated by reference the same as if fully pleaded in Count Four.

96. Plaintiff participated in protected activity when she complained to Defendant that she was treated differently because of her religion. On several occasions, Plaintiff stated to her superior, Alyssa, that she was offended by her use of swear words and vulgar language.

44

97.    In September 2022, Plaintiff complained to Megan Schmidt, HR, that Alyssa's vulgar and crass language was offensive to her because of her religion.

98.    In early Spring 2024, Plaintiff complained to Alyssa that Alyssa's vulgar and crass language was offensive to her because of her religion. Plaintiff also complained to Alyssa that she was afraid that Alyssa's use of vulgar language was harming CCC's reputation in the industry and community.

99.    On May 14, 2024, Plaintiff complained to Emily Faro, HR, that Alyssa's vulgar and crass language was offensive to her because of her religion and that Alyssa had created a hostile work environment. She expressed that Alyssa's hostile treatment caused her stress and anxiety. She also expressed her concern that a low staff morale would have a negative effect on CCC's reputation in the industry and its effectiveness to provide good counseling services. Plaintiff also complained on behalf of her direct reports, Liz and Kass and expressed their ongoing emotional distress because of Alyssa's behaviors towards them.

100.    On May 17, 2024, Plaintiff received an adverse employment action when she received a disciplinary action letter stating that her complaints of discrimination and hostile work environment (on behalf of herself, Liz and Kass) constituted "insubordination." This was an adverse employment action. This letter was in retaliation for Plaintiff taking part in protected activity.

101.    On May 22, 2024, Plaintiff's employment was terminated. This was an adverse employment action and in retaliation for taking part in protected activity.

102.    Defendant's actions caused Plaintiff damages.

103.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

45

## IX.    COUNT FIVE:    HOSTILE WORK ENVIRONMENT BASED ON RELIGION

104.    Paragraphs 1-103 are hereby incorporated by reference the same as if fully pleaded in Count Five.

105.    Defendant's use of curse words in the workplace, vulgar language and harassment towards Plaintiff purposefully and unreasonably interfered with Plaintiff's work performance and created a hostile and offensive work environment.

106.    Defendant's unwanted use of endearing terms of friendship and love, caused a hostile work environment. These gestures were not welcomed by Plaintiff but rather tolerated by Plaintiff in fear that if she objected to the friendship and love gestures from her boss (Alyssa), she may lose her job. Plaintiff's boss used her position of power and knowledge of Plaintiff's religious beliefs to assert these hostile acts on Plaintiff. On several occasions, Plaintiff expressed her dislike of these unwanted friendship and love gestures from Alyssa to her co-worker Kass Mayer. This ongoing harassment by Alyssa purposefully and unreasonably interfered with Plaintiff's work performance.

107.    Defendant's conduct was continuous over several years.

108.    Plaintiff's workplace was permeated with discriminatory intimidation and ridicule that was sufficiently severe that it altered the conditions of her employment.

109.    Defendant's actions caused Plaintiff damages.

110.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## X.    COUNT SIX:    VIOALTION OF THE FAMILY MEDICAL LEAVE ACT, 29 U.S.C. §2615 et seq., INTERFERENCE

111.    Paragraphs 1-110 are hereby incorporated by reference the same as if fully pleaded in Count Six.

112. Plaintiff requested immediate medical leave to care for her mother who had just suffered a heart attack.

113. Plaintiff was employed with Defendant for nearly five years and was an eligible employee under the FMLA. In exercising her rights to take a medical leave of absence, Plaintiff participated in a protected activity known to the Defendant.

114. Defendant is subject to the FMLA.

115. A heart attack is considered a serious medical condition under the FMLA.

116. On Monday May 20, 2024, Plaintiff requested medical leave under the FMLA by sending an email to Alyssa Kolesar, Owner and Emily Faro, Human Resources. The email stated: "I have received this and will try to have response to you by week's end. My mom had a heart attack last week and I will be spending overnights with her this week."

117. Neither Kolesar nor Faro responded to Plaintiff's email, but both sent Plaintiff separate text messages wishing her mother well.

118. Defendant knew of had reason to know Plaintiff was participating in protected activity under the FMLA.

119. Defendant interfered with Plaintiff taking FMLA leave.

120. Plaintiff went to work after giving notice of FMLA leave because she had not received a response from Alyssa or Emily.

121. On Tuesday May 21, 2024, Plaintiff was told by her direct report that Alyssa Kolesar was in town and wanted to meet with Plaintiff.

122. On Wednesday May 22, 2044, Plaintiff emailed Alyssa Kolesar and Emily Faro asking that Emily attend the meeting with Plaintiff and Alyssa.

123. On Wednesday May 22, 2024, Plaintiff arrived at work with the intent to meet with Alyssa Kolesar and Emily Faro. Alyssa met her in the break room when she first arrived, before the meeting, and terminated her employment.

124. Plaintiff was on FMLA leave when her employment was terminated.

125. Plaintiff was denied her federally protected right to FMLA leave.

126. Plaintiff's exercise of her rights under the FMLA was a motivating factor in the Defendant's decision to terminate her employment.

127. As a result of the Defendant's illegal conduct, the Plaintiff has suffered damages in the form of lost wages and other rights, privileges and conditions of employment and has endured mental and emotional distress.

128. The Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**XI.    COUNT SEVEN:    RETALIATION IN VIOALTION OF THE FAMILY MEDICAL LEAVE ACT, 29 U.S.C. §2612 et seq.**

129. The allegations of paragraphs 1-128 are incorporated herein by reference as if fully pleaded herein in Count Seven.

130. Plaintiff was employed with Defendant for nearly five years and was an eligible employee under the FMLA. In exercising her rights to take a medical leave of absence, Plaintiff participated in a protected activity known to the Defendant.

131. The Defendant knew and had reason to know Plaintiff was participating in a protected activity under the FMLA.

132. On Monday May 20, 2024, Plaintiff requested medical leave under the FMLA by sending an email to Alyssa Kolesar, Owner and Emily Faro, Human Resources. The email stated:

"I have received this and will try to have response to you by week's end. My mom had a heart attack last week and I will be spending overnights with her this week."

133. Neither Kolesar nor Faro responded to Plaintiff's email, but both sent Plaintiff separate text messages wishing her mother well.

134. On Tuesday May 21, 2024, Plaintiff was told by her direct report that Alyssa Kolesar was in town and wanted to meet with Plaintiff.

135. On Wednesday May 22, 2044, Plaintiff emailed Alyssa Kolesar and Emily Faro asking that Emily attend the meeting with Plaintiff and Alyssa.

136. On Wednesday May 22, 2024, Plaintiff arrived at work with the intent to meet with Alyssa Kolesar and Emily Faro.  Alyssa met her in the break room when she first arrived, before the meeting, and terminated her employment.

137. Plaintiff was on FMLA leave when her employment was terminated.

138. Plaintiff experienced an adverse employment action two days after she participated in her protected activity.

139. There is a direct causal connection between Plaintiff's request for a FMLA leave of absence and her wrongful termination.

140. Plaintiff's exercise of her rights under the FMLA was a motivating factor in the Defendant's decision to terminate her employment.

141. The Defendant gave no reason for Plaintiff's termination. Any reason now given is pretextual. The Defendant's decision was motivated by unlawful animus toward Plaintiff for having taken leave under the FMLA, or otherwise exercising rights protected by the Federal Family Medical Leave Act.

142. Defendant retaliated against Plaintiff because Plaintiff's exercise of her rights under the FMLA was a motivating factor in the Defendant's decision to terminate her employment.

143. Defendant's actions caused Plaintiff damages.

144. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

XII.   **COUNT EIGHT:   VIOLATION OF CONNECTICUT FAMILY AND LEAVE ACT, INTERFERENCE, C.G.S. §§ 31-55pp (a)(1)**

145. The allegations of paragraphs 1- 144 are incorporated herein by reference as if fully pleaded herein in Count Eight.

146. Plaintiff was employed with Defendant for nearly five years and was an eligible employee under the CT FMLA. In exercising her rights to take a medical leave of absence, Plaintiff participated in a protected activity known to the Defendant.

147. The Defendant knew and had reason to know Plaintiff was participating in a protected activity under the CT FMLA.

148. On Monday May 20, 2024, Plaintiff requested medical leave under the CT FMLA by sending an email to Alyssa Kolesar, Owner and Emily Faro, Human Resources. The email stated: "I have received this and will try to have response to you by week's end. My mom had a heart attack last week and I will be spending overnights with her this week."

149. Neither Kolesar nor Faro responded to Plaintiff's email, but both sent Plaintiff separate text messages wishing her mother well.

150. On Tuesday May 21, 2024, Plaintiff was told by her direct report that Alyssa Kolesar was in town and wanted to meet with Plaintiff.

151. On Wednesday May 22, 2044, Plaintiff emailed Alyssa Kolesar and Emily Faro (HR) asking that Emily attend the meeting with Plaintiff and Alyssa.

50

152.  On Wednesday May 22, 2024, Plaintiff arrived at work with the intent to meet with Alyssa Kolesar and Emily Faro.  Alyssa met her in the break room when she first arrived, before the meeting, and terminated her employment.

153.  Plaintiff was on FMLA leave when her employment was terminated.

154.  Plaintiff experienced an adverse employment action, employment termination, two days after she participated in her protected activity.

155.  There is a direct causal connection between Plaintiff's request for CT FMLA leave of absence and her wrongful termination.

156.  Defendant's actions caused Plaintiff damages.

157.  Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XIII.  COUNT NINE:    VIOLATION OF CONNECTICUT FAMILY AND LEAVE ACT, RETALIATION, C.G.S. §§ 31-55pp (a)(2)

158.  The allegations of paragraphs 1-157  are incorporated herein by reference as if fully pleaded herein in Count Nine.

159.  Plaintiff was employed with Defendant for nearly five years and was an eligible employee under the CT FMLA. In exercising her rights to take a medical leave of absence, Plaintiff participated in a protected activity known to the Defendant.

160.  The Defendant knew and had reason to know Plaintiff was participating in a protected activity under the CT FMLA.

161.  On Monday May 20, 2024, Plaintiff requested medical leave under the CT FMLA by sending an email to Alyssa Kolesar, Owner and Emily Faro, Human Resources. The email

stated: "I have received this and will try to have response to you by week's end. My mom had a heart attack last week and I will be spending overnights with her this week."

162. Neither Kolesar nor Faro responded to Plaintiff's email, but both sent her separate text messages wishing her mother well.

163. On Tuesday May 21, 2024, Plaintiff was told by her direct report that Alyssa Kolesar was in town and wanted to meet with Plaintiff.

164. On Wednesday May 22, 2044, Plaintiff emailed Alyssa Kolesar and Emily Faro asking that Emily attend the meeting with Plaintiff and Alyssa.

165. On Wednesday May 22, 2024, Plaintiff arrived at work with the intent to meet with Alyssa Kolesar and Emily Faro. Alyssa met her in the break room when she first arrived and terminated her employment.

166. Plaintiff was on FMLA leave when her employment was terminated.

167. Plaintiff experienced an adverse employment action, employment termination, two days after she participated in her protected activity.

168. There is a direct causal connection between Plaintiff's request for CT FMLA leave of absence and her wrongful termination.

169. Defendant retaliated against Plaintiff because Plaintiff's exercise of her rights under the CT FMLA was a motivating factor in the Defendant's decision to terminate her employment.

170. The Defendant gave no reason for Plaintiff's termination. Any reason now given is pretextual. The Defendant's decision was motivated by unlawful animus toward Plaintiff for having taken leave under the FMLA, or otherwise exercising rights protected by the Connecticut Family Medical Leave Act.

171. Defendant's actions caused Plaintiff damages.

172. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

### XIV. COUNT TEN:      WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

173. Paragraphs 1-172 are hereby incorporated by reference the same as if fully pleaded in Count Ten.

174. Plaintiff was employed with Defendant.

175. Plaintiff was terminated for an improper reason in violation of public policy.

176. There is an important public policy that people who seek mental health services are provided these services by competent mental health care counselors and professionals.

177. There is an important public policy that professionals working in the mental health care industry are treated fairly and are able to work in an environment free of hostility and verbal abuse.

178. Defendant's improper motive for terminating Plaintiff's employment was in retaliation for Plaintiff complaining about her own hostile work environment and requesting that Human Resources be present at a disciplinary meeting, requesting FMLA leave, complaining about the hostile treatment of her direct reports by Alyssa Kolesar, and complaining that Alyssa's hostile treatment was negatively affecting the morale of the Defendant's staff and therefore having a negative impact on the mental health community at large and negatively affecting Defendant's reputation in the industry and in the public at large.

179. Defendant failed to fairly investigate Plaintiff's complaints and terminated her without discovering the truth of the matter.

180. Defendant acted with malicious intent to harm Plaintiff when Alyssa Kolesar refused to allow Human Resources attend the disciplinary meeting and refused to fairly and completely investigate Plaintiff's claims of a hostile work environment and discrimination.

181. Defendant terminated Plaintiff's employment without a fair investigation because, in part, she requested FMLA leave.

182. Defendant's violation of public policy promotes discrimination in the workplace against its highly religious employees.

183. Defendant violated public policy when it failed to fairly investigate Plaintiff's complaints that the low morale of the staff was a result of Alyssa's hostile acts.

184. Defendant violated public policy when it failed to fairly investigate Plaintiff's complaints that the low morale of the staff negatively affected their mental health counseling work they perform for the local community and the public at large.

185. Plaintiff suffered damages because of Defendant's violation of public policy and its wrongful termination of Plaintiff's employment.

## XV. COUNT ELEVEN:    CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

186. Paragraphs 1-185 are hereby incorporated by reference the same as if fully pleaded in Count Eleven.

187. Plaintiff was employed with Defendant as an at will employee. She entered into an employment agreement when she first began working for Defendant in August 2019.

188. No similarly situated reasonable employee would expect their employer to intentionally, willfully, and with dishonest purpose, discriminate against her because of her religion; terminate her employment while she was on FMLA leave; terminate her employment for bringing complaints of employees to management's attention; retaliate against her for

voicing concerns about how Alyssa's hostility affected staff morale and therefore has an impact on the mental health of the public at large; and would breach its duty by not allowing an employee to include Human Resources in a disciplinary meeting, and then terminate her employment in retaliation for requesting Human Resources be present.

189. Defendant's breach injured Plaintiff's rights to receive the benefit of the employee agreement.

190. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

191. This breach of the implied covenant or good faith and fair dealing, emotional distress and humiliation caused Plaintiff damages.

## XVI. COUNT TWELVE:    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

192. Paragraphs 1-191 are hereby incorporated by reference the same as if fully pleaded in Count Twelve.

193. The unlawful employment actions alleged herein were the direct result of the Defendant's actions to intentionally inflict emotional distress, or that Defendant knew or should have known that such distress was a likely result of its conduct.

194. Defendant's acts of employment discrimination, hostile work environment and wrongful termination towards Plaintiff were so extreme and outrageous as to offend the common decency of any similarly situated individual in her position. No employee should be subjected to a material change in their terms, conditions and privileges of employment based on her religion, overt and constant hostility from her employer, for raising complaints of hostile work environment of her direct reports; and for requesting FMLA leave, as alleged herein.

55

195. The Defendant possessed knowledge of the employment discrimination and hostile work environment as described herein but did nothing to remedy the violations.

196. Plaintiff has experienced severe emotional and psychological injuries as a direct and proximate cause of the Defendant's actions. She has trouble sleeping, suffers heart palpitations, has trouble eating and digesting, suffers headaches, and experiences stress, depression and anxiety. Plaintiff has suffered numerous physical symptoms as a result of the stress and anxiety caused by Defendant and may seek professional help, or pharmaceutical intervention, to manage her extreme distress.

197. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

## XVII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Award Plaintiff compensatory damages for religious discrimination in violation of CFEPA, in an amount to be determined at trial;

b. Award Plaintiff compensatory damages for religious discrimination in violation of Title VII Civil Rights Act, religious discrimination, in an amount to be determined at trial;

c. Award Plaintiff compensatory and punitive damages for Defendant's violations of Connecticut common law (wrongful termination, hostile work environment, defamation, breach of contract, breach of implied covenant of good faith and fair dealing);

d. Award Plaintiff compensatory and punitive damages for Defendant's intentional infliction of emotional distress, in an amount to be determined at trial;

e.      Award Plaintiff compensatory damages for retaliation in an amount to be determined at trial;

f.      Award of punitive damages;

g.      Award of prejudgment interest and costs;

h.      Award attorneys' fees and costs.

i.      Award such other relief in law or equity as this Court deems appropriate.

PLAINTIFF,

GLENDA O'CONNELL

By: _____/s/_____

Kirsten M. Schneider (ct29703)
Law Office of Kirsten Schneider, LLC
P.O. Box 339
Fairfield, CT 06824
(475) 999-8061 tel.
kschneider@kschneiderlaw.com
Her Attorney

EXHIBIT A



**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

**Glenda O'Connell**
COMPLAINANT

CHRO No. 2520096

vs.

EEOC No. 523-2024-04013

**Coastal Connecticut Counseling, LLC**
RESPONDENT

# RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

<u>The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.</u>

**DATE: 11/25/2024**

_Tanya A. Hughes_
Tanya A. Hughes, Executive Director

Service:
Complainant:              Glenda O'Connell, via Email: kschneider@kschneiderlaw.com
Complainant's Attorney:   Kirsten Schneider, Esq., via Email: kschneider@kschneiderlaw.com
Respondent's Attorney:    Patricia E. Reilly, Esq., via Email: preilly@murthalaw.com

EXHIBIT B

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/11/2024

**To:** Ms. Glenda O'Connell
271 Steiner Street
Fairfield, CT 06825
Charge No: 523-2024-04013

EEOC Representative and email:     EMMET GREENE
EEOC Investigator
emmet.greene@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 523-2024-04013.

On behalf of the Commission,

Digitally Signed By:Feng K. An
09/11/2024
Feng K. An
Area Office Director